IN THE SUPREME COURT OF NORTH CAROLINA

No. 419A18

Filed 10 May 2019

IN RE INQUIRY CONCERNING A JUDGE, NO. 17-143
APRIL M. SMITH, Respondent

This matter is before the Court pursuant to N.C.G.S. §§ 7A-376 and -377 upon a recommendation by the Judicial Standards Commission entered 7 November 2018 that Respondent April M. Smith, a Judge of the General Court of Justice, District Court Division, Judicial District Twelve, be publicly reprimanded for conduct in violation of Canons 1, 2A, 3A(3), and 3B(1) of the North Carolina Code of Judicial Conduct, and for conduct prejudicial to the administration of justice that brings the judicial office into disrepute in violation of N.C.G.S. § 7A-376. This matter was calendared for argument in the Supreme Court on 4 March 2019, but determined on the record without briefs or oral argument pursuant to Rule 30(f) of the North Carolina Rules of Appellate Procedure and Rule 3 of the Rules for Supreme Court Review of Recommendations of the Judicial Standards Commission.

*No counsel for Judicial Standards Commission or Respondent.*

ORDER

The issue before the Court is whether District Court Judge April M. Smith, Respondent, should be publicly reprimanded for violations of Canons 1, 2A, 3A(3), and 3B(1) of the North Carolina Code of Judicial Conduct amounting to conduct

prejudicial to the administration of justice that brings the judicial office into disrepute in violation of N.C.G.S. § 7A-376(b). Respondent has not challenged the findings of fact made by the Judicial Standards Commission (the Commission) or opposed the Commission's recommendation that she be publicly reprimanded by this Court.

On 20 February 2018, Commission Counsel filed a Statement of Charges against Respondent alleging that she had engaged in conduct inappropriate to her office by demonstrating a lack of respect for the judicial office and for the Chief District Judge; by failing to facilitate the administrative duties of the Chief Judge and court staff; by repeatedly and regularly making disparaging comments about the Chief Judge to other judges, judicial staff, clerical staff, and members of the local bar; and by failing to diligently discharge her duties, bringing the judicial office into disrepute. Respondent fully cooperated with the Commission's inquiry into this matter. In the Statement of Charges, Commission Counsel asserted that Respondent's actions constituted conduct inappropriate to her judicial office and prejudicial to the administration of justice that brings the judicial office into disrepute or otherwise constituted grounds for disciplinary proceedings under Chapter 7A, Article 30 of the North Carolina General Statutes.

Respondent filed her answer on 9 April 2018. On 20 August 2018, Commission Counsel and Respondent entered into a Stipulation and Agreement for Stated Disposition (the Stipulation) containing joint evidentiary, factual, and disciplinary

stipulations as permitted by Commission Rule 22 that tended to support a decision to publicly reprimand Respondent. The Stipulation was filed with the Commission on 22 August 2018. The Commission heard this matter on 5 October and entered its recommendation on 7 November 2018, which contains the following stipulated findings of fact:

> 1. Respondent is one (1) of ten (10) judges of the General Court of Justice, District Court Division, Judicial District 12 (Cumberland County). She was elected in November 2014 at thirty-five (35) years old along with two (2) other district court judges. In 2017, another district court judge was elected for a total of ten (10) judges. There are eight (8) courtrooms available for district court proceedings in the Cumberland County Courthouse.
>
> 2. The current Chief District Court Judge was elected more than twenty (20) years ago and was appointed Chief Judge commencing January 1, 2015 upon the retirement of the previous Chief District Court Judge. After Respondent's election, the Chief Judge assigned Respondent primarily to serve as one of the court's family court judges and to hear domestic violence matters, although she was also assigned to hear various criminal cases.
>
> 3. At the start of 2015, when Respondent began her service as a judge, she believed her relationship with the Chief Judge to be pleasant and collegial. By the end of 2015, however, Respondent became frustrated with the Chief Judge based on scheduling and communication differences.
>
> 4. Beginning in 2016, Respondent also began experiencing serious health issues that required Respondent to attend frequent medical appointments. Over a period of time, Respondent's health deteriorated as her physicians attempted to determine what medical condition she was dealing with. In 2017, Respondent was diagnosed with two (2) chronic autoimmune diseases—Systemic Lupus Erythematosus and Mixed Connective Tissue Disorder. These two conditions have required

Respondent to receive various medical treatments including chemotherapy and she is subject to experiencing "flares." As a result of these health issues, Respondent has taken multiple leaves of absence. The Chief Judge has accommodated all of Respondent's requests for medical leaves of absence pursuant to physician orders.

5. Thereafter, Respondent's relationship with the Chief Judge deteriorated further because she believed that the Chief Judge was subjecting her to unfair treatment in court assignments. Among other things:

a. Respondent perceived that the Chief Judge assigned her more often to Courtroom 3A than other judges. Courtroom 3A is considered a difficult courtroom because judges who preside there must hear not only their regularly scheduled calendar, but also accept walk-in domestic violence, temporary custody and other cases. This makes presiding in Courtroom 3A a long and often times stressful day.

b. Respondent also believed that she was being assigned disproportionately to Courtroom 3A on Fridays after concluding family court trials and hearings earlier in the week, when other family law judges were not.

c. Respondent believed that the Chief Judge provided other judges with more unassigned days than were provided to her.

d. Respondent believed that the Chief Judge unfairly assigned her to cover other courtrooms when her special sessions concluded while not requiring the same of other judges.

e. Respondent believed the Chief Judge failed to accommodate her requests for unassigned days or time off, either to attend medical appointments, preside over swearing-in ceremonies, attend educational programs for judges, or take vacation time.

6. As a result of the perceptions noted above, Respondent began complaining about her court assignments, unassigned days, and her opinion that the Chief Judge treated her unfairly, to other judges in her

district, retired judges, court staff, and local attorneys, all of whom she considered to be her friends. Respondent also suggested to her case manager and a courtroom clerk that the Chief Judge's decisions regarding her schedule were based in part on racial prejudice.

7. Respondent's frustration about her schedule and her resentment towards the Chief Judge became known throughout the courthouse, notwithstanding the fact that Respondent believed these were private conversations among friends.

8. Respondent at various times sought guidance and advice from the former Chief Judge about how to deal with her relationship with the Chief Judge. In early 2017, in an attempt to seek guidance on how to address what she perceived to be unfair treatment by the Chief Judge, Respondent contacted the North Carolina Administrative Office of the Courts and the Judicial Standards Commission regarding her concerns and frustration about her court schedule and perceived treatment by the Chief Judge. At or around the same time, the Chief Judge independently reached out to the Commission seeking guidance to resolve the situation.

9. In early March 2017, with the consent of both Respondent and the Chief Judge, the Commission referred the matter to the Chief Justice's Commission on Professionalism (CJCP) to assist with resolving the professional differences between the two judges. Shortly thereafter, the Executive Director of the CJCP notified the Commission that his effort to meet with Respondent had failed because Respondent had to unexpectedly cancel their initial meeting due to her deteriorating health condition and necessity of going on medical leave for 30 days. Respondent was advised to contact the CJCP Executive Director to reschedule the meeting, but had not done so by the time the Executive Director retired in the summer of 2017.

10. Notwithstanding Respondent's complaints of an unfair schedule, court statistics and records demonstrate that Respondent was scheduled for and actually presided over fewer court sessions than most of her colleagues in 2016 and 2017. These same statistics and records further show that Respondent had more days off the bench (either as unassigned or personal days off) than

any other judge in the district in 2015 and 2017, and had the second most days off the bench in 2016 (the most days off was for a colleague undergoing cancer treatment).

11. With respect to Courtroom 3A, court records show that Respondent was scheduled for the most court sessions in Courtroom 3A in 2015. That schedule, however, was set in part by the former Chief Judge who left office at the end of 2014, and not the current Chief Judge about whom Respondent repeatedly complains. In addition, the higher number of assignments to Courtroom 3A in 2015 was a reflection not of the Chief Judge's bias, but reflected a pattern of assigning judges based on existing experience, the role of certain judges in presiding over specialized courts, and the necessity of minimizing potential conflicts of interests given Respondent's status as [a] new judge with connections to former clients and certain attorneys. In 2016 and 2017, when the current Chief Judge prepared the entire schedule, Respondent was scheduled, and actually presided, in Courtroom 3A fewer times than several of her colleagues.

12. The Chief Judge similarly accommodated, and continues to accommodate, Respondent's physician ordered medical leaves of absence due to her illness and prepares the court schedules accordingly.

13. The Commission's investigation found that Respondent also engaged in conduct that created a perception that her judicial duties did not take precedence over her personal commitments and work schedule preferences. While Respondent contends that she works diligently to resolve cases and that this periodically results in her concluding the court's business early, the Commission's investigation identified examples of conduct to include the following:

> a. Certain attorneys that frequently appeared before Respondent reported to the Commission that Respondent regularly rushed to conclude cases to avoid working the full afternoon or the next day. This caused some attorneys to have concerns about a full and fair opportunity to be heard, and it placed administrative burdens on court staff.

b. Respondent admits that she often did not take breaks at any specific interval and instead preferred to finish her cases. Respondent encouraged court staff to leave their duty stations to take breaks while court was still in session provided that the electronic recording equipment remained on.

c. Several attorneys reported to the Commission that in open court, Respondent would announce that she was adjourning court early for personal appointments, such as for hair and nail salon visits or to spend time with her child.

d. Respondent's courtroom statements and conduct, coupled with her repeated complaints about her schedule and the Chief Judge, resulted in an unfavorable cartoon about Respondent circulating amongst the bar.

14. Because of these concerns, several members of the domestic bar requested that the Chief Judge remove Respondent from domestic cases. In addition, several judicial and court colleagues brought to the Chief Judge's attention concerns regarding Respondent's work habits and courtroom conduct, especially the frequency of concluding court sessions early and the perceived unwillingness of Respondent to assist other family court judges.

15. After these concerns were brought to his attention, the Chief Judge used his administrative and scheduling authority to reassign Respondent to cover other courtrooms if she concluded her calendars early and had time available that was not otherwise scheduled for time off or unassigned days. The Chief Judge did not take this approach with other domestic judges because he found that they routinely offered to help in other courtrooms or checked in with him when they finished early without prompting.

16. Respondent now acknowledges that her frequent complaints to other judges, court personnel, and members of the local bar regarding her perception that the Chief Judge was being unfair and biased towards her created unintended consequences, including harm to

collegial relations. Respondent further recognizes that even if intended to be private conversations, the cumulative impact of voicing her internal grievance with a colleague to so many people within the courthouse was harmful to public confidence in the administration of the court.

17. Respondent also recognizes that her conduct and statements in the courtroom between 2015 and 2017 were perceived by some attorneys and court staff as indicating a desire to avoid her judicial duties to accommodate her own scheduling preferences and personal circumstances.

(Citations to pages of the Stipulation omitted.)

Based on these findings of fact, the Commission concluded as a matter of law that:

1. Canon 1 of the Code of Judicial Conduct sets forth the broad principle that "[a] judge should uphold the integrity and independence of the judiciary." To do so, Canon 1 requires that a "judge should participate in establishing, maintaining, and enforcing, and should personally observe, appropriate standards of conduct to ensure that the integrity and independence of the judiciary shall be preserved."

2. Canon 2 of the Code of Judicial Conduct generally mandates that "[a] judge should avoid impropriety in all the judge's activities." Canon 2A specifies that "[a] judge should respect and comply with the law and should conduct himself/herself at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary."

3. In addition, Canon 3A(3) requires a judge to "be patient, dignified and courteous to litigants, jurors, witnesses, lawyers and others with whom the judge deals in the judge's official capacity."

4. In accepting this Stipulation and making a recommendation of public reprimand, the Commission distinguishes the Supreme Court's decision in *In re Belk,* 364 N.C. 114, 690 S.E.2d 685 (2012), which found that a single, isolated confrontation between a district court judge

and his or her chief judge, after which the relationship returned to normal, did not support a finding of a violation of Canons 1, 2A, 3A(3) or N.C.G.S. § 7A-376. *See id.* at 126, 690 S.E.2d at 693 ("[w]hile a district court judge must respect the Chief District Court Judge's duties and authority, the nature of the relationship between coworkers may at times produce episodes of contention, disagreement, and frustration . . . [and] discipline is not normally imposed for a single incident of improper behavior exhibited towards a coworker.").

5.      Unlike *Belk,* Respondent's personal conduct in this case went far beyond a single confrontation with her Chief Judge about her court assignments. The Commission's findings of fact, as supported by the Stipulation, show that Respondent's conduct involved a pattern of pervasive complaints attacking the personal integrity and fairness of the Chief Judge to anyone who would listen, including other active and retired judges, court staff, local attorneys, the Administrative Office of the Courts and the Judicial Standards Commission. She also suggested to court personnel working with the Chief Judge that his scheduling decisions towards her were racially motivated. At the same time, the Commission's findings of fact as agreed to by Respondent show no evidence of racial bias or that Respondent's schedule was unfair or burdensome as compared to other judges. On the contrary, the findings of fact establish that the Chief Judge used accepted and reasonable practices in scheduling judges and that the Chief Judge did not assign Respondent to preside in Courtroom 3A more often than her colleagues. Even when she did preside, she admittedly rushed through court sessions to the detriment of the parties and even courtroom staff, whom she would direct to leave their duty stations in the courtroom during ongoing court proceedings if they needed or were entitled to a break. Moreover, Respondent's conduct resulted in requests from the local bar to remove her from domestic courtrooms and the circulation of a cartoon mocking her poor work habits. Respondent now acknowledges that the cumulative impact of her continued conduct in complaining that the Chief Judge was biased and unfair was harmful to public confidence in the administration of the court.

6.    Based on the facts contained in the Stipulation and accepted as the findings of fact herein, the Commission thus concludes as a matter of law that Respondent failed to personally observe appropriate standards of conduct necessary to ensure that the integrity of the judiciary is preserved, in violation of Canon 1 of the North Carolina Code of Judicial Conduct; failed to conduct herself in a manner that promotes public confidence in the integrity of the judiciary, in violation of Canon 2A of the North Carolina Code of Judicial Conduct; and failed to be "patient, dignified and courteous" to her colleagues, the Chief Judge, and those who appeared before her in violation of Canon 3A(3) of the North Carolina Code of Judicial Conduct.

7.    In addition to the conclusions of law as to Canons 1, 2A and 3A(3), the Commission also concludes as a matter of law that Respondent violated Canon 3B(1) of the North Carolina Code of Judicial Conduct, which requires a judge to "diligently discharge the judge's administrative responsibilities, maintain professional competence in judicial administration, and facilitate the performance of the administrative responsibilities of other judges and court officials." This conclusion is based upon (1) Respondent's conduct in consistently complaining about having to preside in court too often, and then when she did preside, at times directing court staff to leave their duty stations while court was still in session in order to take necessary break[s]; and (2) unfairly impugning the Chief Judge's reputation and interfering with the Chief Judge's duties in making court assignments through unjustified attacks on his impartiality and integrity, and disrupting the professionalism, cooperation and collegiality that are the hallmarks of judicial service.

8.    The Commission further finds that Respondent's inexperience and status as a new judge does not excuse her from strict adherence to the ethical standards embodied in the North Carolina Code of Judicial Conduct. As the North Carolina Supreme Court stated in *In re Badgett,* 362 N.C. 482, 666 S.E.2d 743 (2008), "[a] trial judge cannot rely on his [or her] inexperience or lack of training to excuse acts which tend to bring the judicial office into disrepute." *Id.* at 489, 666 S.E.2d at 747-48 (internal quotations omitted). As indicated to Respondent

during the hearing of this matter, in assuming the duties of a judge of the State of North Carolina, Respondent is subject to restrictions on her personal and professional conduct that a private citizen would find burdensome and must accept those burdens gladly and willingly given the enormous power and responsibilities of the judicial office.

> 9. Based on the foregoing, the Commission further concludes that Respondent's violations of the Code of Judicial Conduct amount to conduct prejudicial to the administration of justice that brings the judicial office into disrepute in violation of N.C. Gen. Stat. § 7A-376(b). *See also* Code of Judicial Conduct, Preamble ("[a] violation of this Code of Judicial Conduct may be deemed conduct prejudicial to the administration of justice that brings the judicial office into disrepute"). In reflecting on her conduct, Respondent also agrees that based on the totality of the circumstances, she violated the foregoing provisions of the North Carolina Code of Judicial Conduct and N.C. Gen. Stat. § 7A-376.

(Brackets in original) (Citations to pages of the Stipulation omitted).

Based on these Findings of Fact and Conclusions of Law, the Commission recommended that this Court publicly reprimand Respondent. The Commission based this recommendation on its earlier findings and conclusions and the following additional dispositional determinations:

> 1. The Commission finds that as a mitigating factor, Respondent has agreed to seek the assistance of the Chief Justice's Commission on Professionalism (CJCP) to assist her in developing a more professional and cooperative working relationship with the Chief Judge and her judicial and court colleagues. The Commission notes that its first effort to resolve the Respondent's concerns about her schedule and working with the Chief Judge were referred to the CJCP. Regrettably, Respondent did not follow through in that process for months after she returned from her medical leave of absence, at which time she continued her pattern of complaining about her work schedule and the Chief Judge. It is the Commission's hope

-11-

that this time, Respondent will fully engage in the opportunity to improve her professionalism and understanding of the serious implications of her conduct on public confidence in the administration of justice.

2. The Commission finds as an additional mitigating factor that Respondent has expressed regret over the negative impact that these matters have had on her reputation as a judge, the reputation of the Chief Judge, and the court in which she serves, and that she has a strong commitment to and leadership in support of the community she serves.

3. In making a recommendation of public reprimand, the Commission finds that this sanction is consistent with N.C. Gen. Stat. § 7A-374.2(7), which provides that a public reprimand is appropriate where "a judge has violated the Code of Judicial Conduct and has engaged in conduct prejudicial to the administration of justice, but that misconduct is minor." Although the Commission has some concern that the misconduct at issue is more than "minor," a more severe sanction would require evidence that Respondent willfully engaged in misconduct prejudicial to the administration of justice. *See* N.C. Gen. Stat. § 7A-374.2(1) (definition of censure); *see also In re Nowell*, 293 N.C. 235, 248, 237 S.E.2d 246, 255 (1977) ("*Wilful misconduct in office* is the improper or wrongful use of the power of his office by a judge acting intentionally, or with gross unconcern for his conduct, and generally in bad faith . . . .") (internal citations omitted). Given the agreed upon facts contained in the Stipulation, the Commission concludes that a public reprimand is the most appropriate sanction.

4. The Commission and Respondent acknowledge the ultimate jurisdiction for the discipline of judges is vested in the North Carolina Supreme Court pursuant to Chapter 7A, Article 30 of the North Carolina General Statutes, which may either accept, reject or modify any disciplinary recommendation from the Commission.

5. The Commission and Respondent also acknowledge and agree that although the Respondent has raised her medical issues as a mitigating factor, this disciplinary action is based on misconduct alone as set forth herein and does not bar or limit any future action by the Commission to institute proceedings against

Respondent pursuant to N.C. Gen. Stat. § 7A-376(c) if it appears that Respondent suffers from a physical or mental incapacity interfering with the performance of her judicial duties.

6.     Pursuant to N.C. Gen. Stat. § 7A-377(a5), which requires that at least five members of the Commission concur in a recommendation of public discipline to the Supreme Court, all six Commission members present at the hearing of this matter concur in this recommendation to **publicly reprimand Respondent.**

(Citations to pages of the Stipulation omitted.)

"The Supreme Court 'acts as a court of original jurisdiction, rather than in its typical capacity as an appellate court' when reviewing a recommendation from the Commission." *In re Hartsfield*, 365 N.C. 418, 428, 722 S.E.2d 496, 503 (2012) (order) (quoting *In re Badgett*, 362 N.C. 202, 207, 657 S.E.2d 346, 349 (2008) (order)). Neither the Commission's findings of fact nor its conclusions of law are binding, but they may be adopted by this Court. *Id.* at 428, 722 S.E.2d at 503 (citing *In re Badgett*, 362 N.C. at 206, 657 S.E.2d at 349). If the Commission's findings are adequately supported by clear and convincing evidence, the Court must determine whether those findings support the Commission's conclusions of law. *Id.* at 429, 722 S.E.2d at 503 (citing *In re Badgett*, 362 N.C. at 207, 657 S.E.2d at 349).

The Commission found the stipulated facts to be supported by "clear, cogent and convincing evidence." In executing the Stipulation, Respondent agreed that those facts and information would serve as the evidentiary and factual basis for the Commission's recommendation, and Respondent does not contest the findings or conclusions made by the Commission. We agree that the Commission's findings are

supported by clear, cogent, and convincing evidence, and we now adopt them as our own. Furthermore, we agree with the Commission's conclusions that Respondent's conduct violates Canons 1, 2A, 3A(3), and 3B(1) of the North Carolina Code of Judicial Conduct, and is prejudicial to the administration of justice, thus bringing the judicial office into disrepute in violation of N.C.G.S. § 7A-376.

This Court is not bound by the recommendations of the Commission. *Id.* at 428-29, 722 S.E.2d at 503. Rather, we may exercise our own judgment in arriving at a disciplinary decision in light of Respondent's violations of several canons of the North Carolina Code of Judicial Conduct. *Id.* at 429, 722 S.E.2d at 503. Accordingly, "[w]e may adopt the Commission's recommendation, or we may impose a lesser or more severe sanction." *Id.* at 429, 722 S.E.2d at 503. The Commission recommended that Respondent be publicly reprimanded. Respondent does not contest the Commission's findings of fact or conclusions of law and voluntarily entered into the Stipulation with the understanding that the Commission's recommendation would be a public reprimand.

We appreciate Respondent's cooperation and candor with the Commission throughout these proceedings. Furthermore, we recognize Respondent's expressions of remorse and her willingness to seek assistance from the CJCP to improve her professional reputation and repair her relationship with the Chief Judge. Weighing the severity of Respondent's misconduct against her candor and cooperation, we conclude that the Commission's recommended public reprimand is appropriate.

IN RE SMITH

*Order of the Court*

Therefore, the Supreme Court of North Carolina orders that Respondent April M. Smith be PUBLICLY REPRIMANDED for conduct in violation of Canons 1, 2A, 3A(3), and 3B(1) of the North Carolina Code of Judicial Conduct, and for conduct prejudicial to the administration of justice that brings the judicial office into disrepute in violation of N.C.G.S. § 7A-376.

By order of the Court in Conference, this the 10th day of May, 2019.

s/Earls, J.
For the Court

Justice DAVIS did not participate in the consideration or decision of this case.

WITNESS my hand and the seal of the Supreme Court of North Carolina, this the 10th day of May, 2019.

AMY L. FUNDERBURK
Clerk of the Supreme Court

s/M.C. Hackney
Assistant Clerk

-15-